**UNITED STATES of America,**

v.

**Juan Pablo BALLESTEROS GUTIERREZ, Defendant.**

**No. 01 CRIM. 258(LAK).**

United States District Court, S.D. New York.

Jan. 11, 2002.

Katherine M. Choo, Timothy J. Coleman, W.S. Wilson Leung, Assistant United States Attorneys, James B. Comey, Acting United States Attorney, for U.S.

Paul Shechtman, Michael J. Grudberg, Stillman & Friedman, P.C., for defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Defendant in this insider trading case moves *in limine* to exclude evidence of trading activity by persons other than the defendant and to redact the indictment accordingly as well as for a bill of particulars.

### Facts

The three count indictment in this case charges defendant Juan Pablo Ballesteros Gutierrez with conspiracy to commit securities fraud in violation of Sections 10(b), 14(e) and 32 of the Securities Exchange Act of 1934 ("Exchange Act")[1] and Rules 10b–5 and 14e–3 thereunder,[2] *see* 18 U.S.C. § 371, and with the corresponding substantive offenses. In order fully to understand the indictment's allegations, it is essential to bear in mind the structure of part of defendant's family and certain of its financial interests.[3]

### The Ballesteros Family and its Interests

Defendant is the second oldest of the four sons of the late Jose Luis Ballesteros Franco ("Jose Luis") who, at times relevant to this case, was a director and member of the audit committee of Nalco Chemical Company ("Nalco"), the common stock of which was traded on the New York Stock Exchange. His three brothers are referred to here as "Junior," Alejandro and Ricardo. Defendant's uncle Jorge is the brother of Jose Luis.

The Ballesteros family benefitted from and controlled a number of trusts and other entities during the relevant period. The names, beneficiaries, owners, and identities of those controlling investments by these entities are summarized as follows:

1. 15 U.S.C. §§ 78j(b), 78n(e), 78ff.

2. 17 C.F.R. §§ 240.10b–5, 240.14e–3(a).

3. The facts alleged herein are those alleged in the indictment. The government of course will bear the burden of proving them at trial.

| Entity | Beneficiaries/Stockholders | Investment Authority |
|---|---|---|
| Gianni Trust | Jose Luis, Jorge, their mother and siblings | Jorge |
| Cardinal Trust | Jorge and his family | Jorge |
| Tula Trust | Jose Luis, his wife and children including defendant | Jose Luis |
| Unidentified English trust | Jose Luis beneficial owner | Jose Luis |
| Casford Limited | Defendant | Defendant |
| Interconsulting Limited | Junior | Junior |

*The Suez Tender Offer*

In or about the first quarter of 1999, Nalco began exploring strategic alternatives, including a possible sale of the company. On or about April 27, 1999, Suez Lyonnaise des Eaux ("Suez"), a publicly held French company, the shares of which are traded on the Paris Bourse, advised Nalco of its interest in acquiring Nalco in a cash transaction. Jose Luis learned of the proposal, which was material nonpublic information, on the following day at a Nalco board meeting.

The proposal progressed over the following weeks. On or about May 25, 1999, Suez sent a non-binding proposal to Nalco for a cash acquisition of the company at a price of $52 per common share, a premium of 53 percent over Nalco's then current market price and 66 percent over its three month weighted average price. The proposal was discussed at a Nalco board meeting on June 5, 1999 at which Jose Luis learned the details, which remained nonpublic. The Nalco board decided that the price was too low. But four days later, on June 9, the two companies reached an agreement, subject to successful negotiation of a merger agreement, for Suez to acquire Nalco at a price of $54 per share.

The agreement, as well as other nonpublic details, were discussed at a Nalco board meeting on June 17 at which Jose Luis was present.

*The Trading*

Promptly after the June 17 board meeting, Jose Luis began buying Nalco shares in accounts owned by the Tula Trust and the unidentified English trust, amassing a total of 63,000 shares at an average price in the mid- to high $30 range by the close of business on June 23. Nor were these the only family purchases.

- On June 22, Jorge bought $5.7 million worth of Nalco shares in accounts owned by the Gianni and Cardinal Trusts at an average price below $37 per share.

- On or about June 21, defendant and one or more of his three brothers contacted a broker at Stanford Group, where defendant maintained the Casford account, and advised that all wished by buy Nalco shares. On the following day, Junior opened the Interconsulting account at Stanford in order to buy Nalco shares for himself,

Alejandro and Ricardo. Over the next few days, the defendant and his brothers bought thousands of Nalco shares through Stanford Group, defendant in the Casford account and his brothers in the Interconsulting account.

- During the same time period, Junior tipped a friend and business associate, informed him about the forthcoming transaction, and asked to borrow $200,000 to buy Nalco shares. The friend agreed to loan the money and bought 4,365 shares of Nalco stock pursuant to an understanding that Junior would receive a share of any profits.

The Nalco–Suez deal was finalized between the two companies on or about June 27 and announced publicly on June 28. On or about July 1 and 2, Jose Luis, Jorge and defendant's three brothers sold all of the Nalco shares they had purchased, realizing a profit of $3,425,850. Defendant, on or about November 15, 1999, tendered his shares to Suez and thereby realized a profit of $106,000.

*The Government's Theory*

Not surprisingly, the government alleges that Jose Luis directly or indirectly tipped his brother, Jorge, and all of his sons, including defendant, about the Suez tender offer in order to enrich the family and that all of the trading took place pursuant to a conspiracy among the Ballesteroses.

*Discussion*

*The* In Limine *Motion*

The essence of defendant's position is that there is unlikely to be any direct evidence that Jose Luis tipped defendant and that proof of the trading activity of the uncle, the three brothers and of Junior's friend would be an effort to establish defendant's guilt by association. This evidence, he maintains, is irrelevant or, in any case, insufficiently probative to overcome its prejudicial effect.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[4] The pivotal issues in this case are whether there was a conspiracy involving Jose Luis and other family members to trade on inside information, whether defendant was a party to that conspiracy and, independent of any conspiracy, whether defendant in fact traded on the basis of material nonpublic information.

Relevance is not a particularly difficult question in this case. Jose Luis obtained inside information through his membership on the Nalco board. Promptly thereafter, he, his brother and each of his four sons bought Nalco shares, most in large amounts. The brothers all bought through the same broker, all but defendant opening a new account for that purpose. All of the family members but the defendant sold almost immediately upon the announcement of the previously secret information concerning the proposed takeover. The size of the purchases, their temporal proximity to Jose Luis' receipt of the nonpublic information, the use by the three brothers of defendant's broker with whom they did not previously have accounts, and the prompt sales are more consistent with the sharing of the inside information to enable the family members to turn a quick profit with little or no risk[5] than with investment decisions independently arrived at on the basis of public information. And while

---

4. FED.R.EVID. 401.

5. The motive of the alleged tipper, Jose Luis, is clearly pertinent. *See, e.g., United States v. Falcone*, 257 F.3d 226, 230 (2d Cir.2001).

defendant's failure to sell promptly after the public announcement undermines this inference in his case, it does so in degree only. In consequence, the evidence concerning the trading pattern plainly is relevant.[6]

■ Nor is there any basis for excluding this evidence under Rule 403. To begin with, Rule 403 permits exclusion of relevant evidence on grounds of prejudice only where the prejudice would be unfair. Unfairness does not result from the tendency of the evidence to prove an adversary's case.[7] "Unfair prejudice," according to the Advisory Committee Note to Rule 403, "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

■ In this case, the family relationships, the temporal proximity of the trades to Jose Luis' receipt of inside information and to each other, and even the size of the trades all give rise to the inference that the trades took place pursuant to a common scheme and that they were based on the inside information. Indeed, the size of the trades, which the Court initially supposed might be extraneous to the real issues, on reflection is probative—many people do not invest hundreds of thousands or millions of dollars in a single stock, least of all in parallel with other family members, without the group having some reason to believe that the investments are a "sure thing" or something approaching it, a premise from which a jury might be inclined to draw the inferences that the government seeks. While there is a risk of unfair prejudice based on jealousy or antipathy to the Ballesteroses' wealth, that risk does not substantially outweigh the probative value of the evidence.

Defendant nevertheless makes two additional arguments, one that the result he seeks is supported by *United States v. Marcus Schloss & Co.*[8] and the other based on his supposition as to the proof that the government will offer at trial. Neither is persuasive.

*Marcus Schloss* was an insider trading case in which the indictment alleged that the tipper conveyed inside information about five different planned takeover bids to five somewhat overlapping groups of tippees and that all traded pursuant to a common conspiracy. The case as to one of the alleged tippees and his "sub-tippee," if you will, Schloss and Yagoda, however, had been severed prior to trial. Schloss and Yagoda then moved to preclude proof at their trial of tips to others by the common

---

**6.** *See, e.g., SEC v. Warde*, 151 F.3d 42, 48 (2d Cir.1998) (parallel trading of defendant and another supports inference that inside information disclosed to defendant); *SEC v. Euro Security Fund*, No. 98 Civ. 7347(DLC), 2000 WL 1376246, at *1–4 (S.D.N.Y. Sept.25, 2000) (circumstantial evidence including trading patterns sufficient to withstand motion for judgment as a matter of law); *United States v. Pileggi*, No. 97–CR–612–2, 1998 WL 288283, at *2 (E.D.Pa. June 3,1998) (motion to preclude evidence of trading by defendant's brother and nephew denied because "the suspicious pattern and timing of the trades by defendant's blood relatives permits a reasonable inference to be drawn that defendant possessed inside information"); *SEC v. Sing-er*, 786 F.Supp. 1158, 1164–65 (S.D.N.Y.1992) ("circumstantial evidence such as suspicious timing of trades, contacts between potential tippers and tippees, and incredible reasons for such trades provide an adequate basis for inferring that tipping activity has occurred").

**7.** *E.g., United States v. Gallego*, 913 F.Supp. 209, 213 (S.D.N.Y.1996), *aff'd*, 191 F.3d 156 (2d Cir.1999), *cert. denied, Martinez v. United States*, 528 U.S. 1127, 120 S.Ct. 961, 145 L.Ed.2d 833, *Gallego v. United States*, 530 U.S. 1216, 120 S.Ct. 2220, 147 L.Ed.2d 252 (2000).

**8.** 710 F.Supp. 944 (S.D.N.Y.1989).

tipper. Judge Haight granted the motion under Rule 403, writing that:

"It is fair to require the government to prove its conspiracy and substantive charges against Yagoda and Schloss on the basis of their own acts, and not the acts of others. It would be unfair to require Yagoda and Schloss to explain and defend not only their own acts, but the acts of others.... Indeed, how could counsel for Yagoda and Schloss fairly be expected to defend and explain the acts of others such as Teicher? Teicher, awaiting his own separate trial, is not likely to be forthcoming and cooperative. And yet the jury would hear detailed evidence of Teicher's tips and trades, with counsel for Yagoda and Schloss essentially helpless to deal with them, or to prevent the inevitable, cumulative, spillover effect upon their own clients.

"The government, on the other hand, has no pressing need for evidence of other defendants' acts to convict Yagoda and Schloss. David [the alleged tipper] will presumably be the principal witness against Yagoda and Schloss; if the jury credits his testimony, as foretold by the indictment, the jury will have a sufficient factual basis to convict Yagoda and Schloss on the conspiracy and substantive securities counts. On the other hand, if the evidence of wrongdoing by Yagoda and Schloss is relatively weak, but stronger against the Teicher defendants—I speak only hypothetically, I know nothing of the evidence—Yagoda and Schloss would be unfairly prejudiced by evidence of the wrongful acts of others, acts they did not themselves control. And that unfairness would exist even assuming that Yagoda and Schloss were generally aware of the existence of other unknown tippees, and hence participants in a single conspiracy...." [9]

*Marcus Schloss* will not bear the weight defendant would place upon it. The details concerning the trades with which we are concerned here—including the family relationships among the traders, their virtual simultaneity, and their temporal proximity to Jose Luis' receipt of material nonpublic information—are highly probative of the existence of a conspiracy among the members of the Ballesteros family. In *Marcus Schloss*, on the other hand, the probative value of evidence of tips on other takeovers and trading on those other tips, whatever it might have been, was far smaller. The Rule 403 balance in that case, in other words, was far more strongly in the moving defendants' favor than is the case here.[10]

Finally, defendant suggests that there will be no direct evidence of any tip to the

---

**9.** *Id.* at 954.

**10.** As the quoted passage indicates, the *Marcus Schloss* court took into account also the fact that the government had little need for the excluded evidence. This Court is not entirely certain that the government's need for the evidence, as distinct from its probative value, is a pertinent consideration. After all, if evidence threatens unfair prejudice substantially outweighing its probative value, it is difficult to see why the government's need for it should enter into the equation. To hold so would be to come perilously close to saying that, all other things being equal, the government is entitled to benefit from unfair prejudice where its case is weak but not where its case is strong. In any case, however, the government's need for the evidence at issue in this case (as well as its probative value) is far greater than its need for the evidence precluded in *Marcus Schloss*. Here, the alleged tipper, Juan Luis, is dead and his brother, Jorge, is a fugitive. The prosecution thus rests largely on circumstantial evidence, as commonly occurs in conspiracy cases. Excluding the evidence to which defendant's motion is addressed would gut the government's case. *Marcus Schloss*, on the other hand, was an entirely different situation, as the alleged tipper was a government against the moving defendants.

defendant, that his three brothers will testify that they were tipped by Jose Luis but deny passing the information on to defendant, and that evidence of trading by the brothers and others would be unfairly prejudicial. There are, however, two short answers to the argument. First, the evidence is highly probative of a common scheme to trade on inside information irrespective of what defendant's brothers might say, and the jury certainly would be entitled to conclude that the brothers, assuming they so testify, would be trying to exculpate defendant without regard to truth. Second, the Court is not prepared in a criminal case to make such assumptions about what the evidence will show at trial. There is no summary judgment in criminal cases, and for good reason.

That leaves only the evidence regarding the trading by Junior's friend, but that need not take long. Given the allegations of the indictment, a jury would be entitled to infer that those trades in substance were trades by Junior. Accordingly, the Court will not exclude them for all the reasons given above.

*Bill of Particulars*

Defendant requested a bill of particulars (1) stating whether the government intends to offer direct proof of the receipt by defendant of material, nonpublic information regarding Nalco and, if so, details concerning the nature of the alleged proof, and (2) identifying any coconspirators known to the government who are not identified in the indictment. Because defendant is satisfied with the government's statement that Jose Luis "disclosed material, nonpublic information about [Nalco's] business plans to defendant between [June 17, 1999] and the time defendant contacted

his broker at Stanford Group Company approximately three days later, on or about June 21, 1999," [11] he has withdrawn the first request.

 As for defendant's second request, a bill of particulars is not a general investigative tool for the defense or a device to compel pretrial disclosure of the government's evidence.[12] Given the limited nature and duration of the alleged conspiracy, he is not entitled to identification of coconspirators.[13]

### Conclusion

For the foregoing reasons, defendant's motion is denied in all respects.

SO ORDERED.

**11.** Gov. Mem. at 18; Shechtman Aff. ¶ 5.

**12.** *E.g., United States v. Persico,* 621 F.Supp. 842, 868 (S.D.N.Y.1985) (collecting cases).

**13.** *See, e.g., United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990).