11-3-cr
United States v. Contorinis

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued:  January 5, 2012          Decided: August 17, 2012)

Docket No.  11-3-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

Appellee,

v.

JOSEPH CONTORINIS,

Defendant-Appellant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER, HALL, and CHIN, Circuit Judges.

Appeal from a conviction by a jury in the United States District Court for the Southern District of New York (Richard J. Sullivan, Judge), for conspiracy to commit securities fraud and insider trading.  Appellant challenges the jury instructions, admission of evidence concerning the trading activity of other alleged tippees, and the amount of the forfeiture order.  We affirm the conviction, vacate the forfeiture order, and remand.

ROBERTO FINZI (Theodore V. Wells, Jr., Mark F. Pomerantz, & Farrah R. Berse, on the brief), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, for Defendant-Appellant.

ANDREW L. FISH, Assistant United States Attorney (Reed M. Brodsky, Assistant United States Attorney on the brief), for Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, for Appellee.

WINTER, Circuit Judge:

Joseph Contorinis appeals from his conviction by a jury before Judge Sullivan for conspiracy to commit securities fraud and insider trading and from the district court's forfeiture order in the amount of $12.65 million. Appellant claims error in: (i) a jury instruction that allegedly did not adequately convey the definition of material, nonpublic information; (ii) the admission of evidence of contemporaneous trades by individuals who received inside information from the same source as appellant; and (iii) the amount of the forfeiture order entered by the district court. We hold that the district court properly instructed the jury on the definition of material, nonpublic information and acted within its discretion in admitting evidence concerning the trades by other individuals. However, we conclude that the court erred in ordering appellant to forfeit gains acquired by his employer but not by him. We therefore affirm appellant's conviction but vacate the forfeiture order and remand for further proceedings.

BACKGROUND

Given the jury's verdict, we view the evidence and inferences drawn therefrom in the light most favorable to the government. United States v. Chavez, 549 F.3d 119, 124 (2d Cir. 2008).

During the relevant time period, appellant was employed, with Michael Handler, as a co-portfolio manager of the Jeffries Paragon Fund ("Fund"). The Fund invested in companies in the retail and personal products sectors. As portfolio managers, Handler and appellant made investment decisions but did not control disbursements of profits.

Sometime in 2000, appellant met and befriended Nicos Stephanou, who became an investment banker in the Mergers and Acquisitions group at UBS in 2002. Thereafter, appellant and Stephanou spoke on the telephone often, sometimes as much as 75 times a month. Stephanou regularly provided confidential information to several friends. These "tippees" included a California employee of a semiconductor company, an individual working in an import/export business in New York, and two individuals living in Cyprus.

On September 2, 2005, Albertsons grocery store chain ("ABS") announced that it was exploring options to increase shareholder value, including a possible sale of the company. Appellant then purchased a large amount of ABS stock on behalf of the Fund. On the same day, Stephanou was assigned to a team

3

at UBS that was to represent a potential purchaser of ABS. Stephanou testified that he informed appellant of his role, and that appellant asked Stephanou to keep him informed about the deal.

Subsequently, on November 22, Stephanou received information suggesting that it was then more likely than not that an acquisition of ABS would occur. Stephanou conveyed that information to appellant and his other friends. On the same day, appellant purchased 250,000 shares of ABS on behalf of the Fund. He testified that this purchase was motivated by a worse than expected earnings report by ABS. Stephanou's other tippees also purchased shares around this time.

On December 6, Stephanou learned that the likelihood of the deal had been drastically reduced. Nevertheless, appellant purchased 126,000 shares of ABS the following morning. He testified that he believed that offers at the end of the bidding period, December 7, the next day, would increase the stock price. Appellant became unavailable for a few hours, and Handler began to sell ABS stock. Handler testified that he sold the stock because he mistakenly believed the bidding period was over. When appellant became available, appellant continued to sell. The Fund sold the vast majority of its position in ABS on December 7, closed out its long position on December 8, and then briefly went short. Appellant made the lion's share of these trades. The other tippees also closed out their positions in ABS during the same time frame.

4

On December 9, Stephanou was told that the deal was back on and could be announced on the 19th. That day Stephanou purchased shares of ABS, and several of his tippees did as well. Two days later, Stephanou was involved in a conference call discussing the details of the proposed transaction. Immediately following that call, Stephanou spoke with appellant, and the Fund purchased over $38 million of ABS the next day.

Stephanou testified that he learned on December 17 that the deal was going to happen and would be announced later in the week. Phone records showed that Stephanou spoke with appellant several times over the next two days. The Fund purchased over 300,000 shares of ABS between December 19 and 20. On December 21, several media outlets reported that talks had broken down and that the deal was unlikely to occur. Stephanou testified that he repeatedly relayed information about the deal to appellant. Phone records showed several calls between the two during this time. Until the media reports, the details looked positive, but ultimately it was determined that antitrust concerns in the Chicago market would hold the deal up. Stephanou then advised appellant that the transaction was not going forward. The next day, December 22, Stephanou sold his position in ABS, shorted the stock, and advised appellant and the other tippees of the moribund status of the deal. The Fund also sold all of its stock in ABS, and

5

the other tippees did the same.  However, media reports in the morning of December 22 stated only that the deal was uncertain, but not necessarily dead.  Only after the markets closed on December 22, and Stephanou, his other tippees, and the Fund had sold all their ABS shares, did ABS announce that talks about the sale had been terminated.  ABS stock dropped in price significantly the next morning.

In late December and into early January 2006, Stephanou received reports that the acquisition of ABS was back on track. In response, he purchased ABS stock on January 11.  He also informed appellant that the deal was gaining traction and that a transaction would likely be announced in the coming weeks. On that day, appellant purchased approximately 1.1 million shares of ABS stock for the Fund.  Stephanou's other tippees also bought ABS stock at this time.  In his testimony, appellant attributed the purchase to a belief that comments by the CEO of one of the would-be purchasers implied that ABS would be acquired.  On January 12, appellant purchased 900,000 additional shares of ABS.  Then, on January 13, the New York Post announced that negotiations had reopened and the Fund purchased another 200,000 shares, bringing its holdings to over 2.3 million shares.  The Fund sold 500,000 shares two days later but then repurchased them the following day.  Finally, the sale of ABS was announced on January 23 and the Fund sold its entire ABS holdings that day, reaping a net profit of

6

approximately $3 million through its December and January trades. Stephanou testified that, beginning in September, 2005, and ending in January, 2006, he had kept appellant informed of the status of the deal and expected date of the announcement.

Prior to trial, appellant objected to evidence about the trades of Stephanou's other tippees. In denying appellant's motion to exclude that evidence, the court stated that it had considered the parties' arguments concerning district court opinions in United States v. Marcus Schloss & Co., Inc., 710 F. Supp. 944 (S.D.N.Y. 1989) (excluding evidence of trades by others), and United States v. Ballesteros Gutierrez, 181 F. Supp. 2d 350 (S.D.N.Y. 2002) (admitting such evidence), and concluded that the reasoning in Ballesteros was more fitting in this case. The court found that the trading patterns of the other tippees were probative because they tended to show that the trades of the tippees were more consistent with the sharing of inside information than with independent investment decisions. Based on the balancing done in Ballesteros, the court saw no reason to exclude the evidence under Rule 403 but stated that it was open to a limiting instruction. No such instruction was requested.

Appellant also objected to the jury charge on the basis that the court's definition of "material, nonpublic information" did not adequately explain when confirmation of

7

publicly known or rumored information can be considered material and nonpublic.

The jury found appellant guilty of conspiracy and insider trading on the counts relating to the trades made on December 22 and January 11. Appellant was sentenced to 72 months' imprisonment and was ordered to forfeit approximately $12.65 million -- the profits made by the Fund on appellant's trades in his capacity as agent of the Fund.

This appeal followed.

DISCUSSION

a) Jury Instructions

We review jury instructions de novo to determine whether the jury was misled or inadequately informed about the applicable law. Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 146 (2d Cir. 2010).

As pertinent here, the crime of insider trading required the government to prove beyond a reasonable doubt that Stephanou had a duty to UBS not to convey material, nonpublic information about deals in progress to outsiders, See Dirks v. SEC, 463 U.S. 646, 662 (1983), and that appellant received such material, nonpublic information in breach of that duty and used the information to trade relevant securities, see id. That Stephanou had the requisite duty is not contested. However, appellant testified that he never received any information from Stephanou about deals Stephanou was working on and that

appellant's trades in ABS were based solely on information available to the public or professional investors like himself.

Although appellant's denial of receiving any information from Stephanou no doubt reduced the importance of the definition of material, nonpublic information in the jury's deliberations -- if it found appellant to be lying, the chances of an acquittal would be low -- the government still had to prove that the information Stephanou claimed to have given appellant was material and nonpublic. Appellant claims that the definition of material, nonpublic information given in the district court's instructions was erroneous.

The pertinent instruction read:

> Information is nonpublic if it was not available to the public through such sources as press releases, Securities and Exchange Commission filings, trade publications, analysts' reports, newspapers, magazines, rumors, word of mouth or other sources. In assessing whether information is nonpublic, the keyword is "available." If information is available in the public media or in SEC filings, it is public. However, the fact that information has not appeared in a newspaper or other widely available public medium does not alone determine whether the information is nonpublic. Sometimes a corporation is willing to make information available to securities analysts, prospective investors, or members of the press who ask for it even though it may never have appeared in any newspaper publication or other publication. Such information would be public. Accordingly, information is not necessarily nonpublic simply because there has been no formal announcement or because only a few people have been made aware of it. For example, if UBS policy was to give out certain information to people who ask for it,

9

that information is public information. Whether information is nonpublic is an issue of fact for you to decide.

On the other hand, the confirmation by an insider of unconfirmed facts or rumors -- even if reported in a newspaper -- may itself be inside information. A tip from a corporate insider that is more reliable or specific than public rumors is nonpublic information despite the existence of such rumors in the media or investment community. Whether or not the confirmation of a rumor by an insider qualifies as material nonpublic information is an issue of fact for you to decide.

. . .

Within the particular context of the purchase and sale of securities, "material" information is information which a reasonable investor would have considered significant in deciding whether to buy, sell, or hold securities, and at what price to buy or sell.

Appellant argues that this jury instruction did not properly inform the jury because it failed to include the following language, or variations thereon:[1]

---

[1] Appellant submitted two variations as proposed instructions: Although information in a newspaper or an analyst report is public, an insider's confirmation of published information may itself constitute material nonpublic information if it discloses significant details that are not apparent from what is public, such as the certainty that a rumored event in fact will occur. However, if an insider simply repeats what has appeared in the public press, the repetition of that information is not material nonpublic information. A generalized confirmation of an event that is obvious to every market participant who is knowledgeable about a company is not material information. Speculative information also may not rise to the level of materiality. It is a fact issue for you to decide whether Mr. Stephanou was sufficiently different from the information that was available in the marketplace to be material.

and

A generalized confirmation of an event that is obvious to every market participant who is knowledgeable about a company is not material information. Speculative information also may not rise to the level of materiality. It is a fact issue for you to decide whether Mr. Stephanou provided Mr. Contorinis

A generalized confirmation of an event that is fairly obvious to investors knowledgeable about the company or the particular security at issue -- here Albertsons or Albertsons stock -- is not material information. In order to be nonpublic and material, information must be different from general discussions in the marketplace at the time. Even if an event, like a corporate merger, may be important, information about that event is not material unless it contains something beyond what already was known to the public from news articles, analyst reports, or otherwise, and the additional information likely would have been significant to a reasonable investor. A generalized confirmation of an event that is fairly obvious to market participants who are knowledgeable about a company is not material information. Likewise, speculative information is not material. The mere fact that some discussion has taken place on matters that may or may not occur is not material unless it goes beyond speculation and relates to existing facts.

In appellant's view, the critical omission in the instructions given by the court was the lack of language indicating that general confirmation of an event that is "fairly obvious" to knowledgeable investors is not material, nonpublic information. Conversely, he objects to the court's instruction that stated, "[t]he confirmation by an insider of unconfirmed facts or rumors -- even if reported in a newspaper -- may itself be inside information. We disagree.

---

with any nonpublic information, and whether any such information was sufficiently different from the information that was available in the marketplace to be material.

We first discuss materiality and nonpublic status as separate concepts. Information is material when there is a substantial likelihood that a reasonable investor would find it important in making an investment decision. <u>See</u> <u>United States v. Cusimano</u>, 123 F.3d 83, 88 (2d Cir. 1997) (citing <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231-32 (1988)). To be material, information must "alter[] the 'total mix' of information available." <u>Id.</u> Of course, information is public if it is available to the public through SEC filings, the media, or other sources. <u>See</u> <u>SEC v. Mayhew</u>, 121 F.3d 44, 50-51 (2d Cir. 1997). As the district court instructed the jury, information is also deemed public if it is known only by a few securities analysts or professional investors. This is so because their trading will set a share price incorporating such information.

While the concepts of materiality and nonpublic status refer to different things, there is considerable overlap for purposes of insider trading analysis. The content of a piece of information may be of importance in affecting the share price but so well-known that it does not alter the mix of available information and is therefore not deemed to be material. Conversely, the same information, if previously unknown to the public, may alter substantially the mix of information and thus be deemed very material. Information also comes in varying degrees of specificity and reliability, and the extent to which a newly reported item of information alters

12

the total mix may depend on the specificity or reliability of that information. See id. at 52.

In Elkind v. Liggett & Myers, Inc., 635 F.2d 156 (2d Cir. 1980), we held that a tip stating that an upcoming earnings report would reflect lower sales was not material where that fact was already common knowledge among analysts and the company had previously stated that a decline in sales was expected. Id. at 166. However, we indicated that if the tip had included additional details, such as the expected amount of the decrease, it would have been material. Id.

Similarly, a tip that provides additional reliability to existing information about the status of a transaction based on the source's access to inside information may be material because it lessens the risk from uncertainty. See Mayhew, 121 F.3d at 52.

Insiders often have special access to information about a transaction. Rumors or press reports about the transaction may be circulating but are difficult to evaluate because their source may be unknown. A trier of fact may find that information obtained from a particular insider, even if it mirrors rumors or press reports, is sufficiently more reliable, and, therefore, is material and nonpublic, because the insider tip alters the mix by confirming the rumor or reports. Id.

We conclude that the district court's instructions adequately conveyed the applicable standards. The charge

13

informed the jury that for information to be material it must be considered significant by reasonable investors. It conveyed to the jury that material, nonpublic information is information that either is not publicly available or is sufficiently more detailed and/or reliable than publicly available information to be deemed significant, in and of itself, by reasonable investors.

To the extent that appellant's suggested charges focused entirely on the content of reports or tips, excluding from consideration the reliability of the source, they misstated the law. See United States v. Abelis, 146 F.3d 73, 82 (2d Cir. 1998) (holding that defendant "bears the burden of showing that the requested instruction 'accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced.'" (quoting United States v. Dove, 916 F.2d 41, 45 (2d Cir. 1990))) In other respects, the court's instructions conveyed the substance of those requested by appellant.

b)  Evidence of Other Trades

Appellant also argues that the district court should have excluded the evidence concerning trades of other individuals under Fed. R. Evid. 403, which states that evidence may be excluded if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury."

14

Given the district courts' "broad discretion over the admission of evidence," United States v. McDermott, 245 F.3d 133, 140 (2d Cir. 2001), we review evidentiary rulings only for abuse of discretion. SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 119 (2d Cir. 2006). This deferential standard is of particular importance with regard to evidentiary rulings under Rule 403 because "[a] district court is obviously in the best position to do the balancing mandated by Rule 403." United States v. Salameh, 152 F.3d 88, 110 (2d Cir. 1988).

On appeal, as in the district court, the parties' arguments focus on which of the differing district court opinions in Marcus Schloss and Ballesteros we should adopt. However, we are skeptical as to whether a general rule, rather than a case by case analysis, regarding admission or exclusion of evidence of trades by other alleged tippees in insider trading cases is appropriate. In Marcus Schloss and Ballesteros, the evidence of other trades was relevant to the extent of a particular conspiracy. See Marcus Schloss, 710 F. Supp. at 951; Ballesteros, 181 F. Supp. 2d at 356.

Here, however, there is no allegation that appellant and the other tippees were co-conspirators. Rather, the other tippees were strangers to appellant. In that light, the government's argument that the evidence of the other trades tends to show that appellant traded on inside information

15

arguably contains a danger of substantial prejudice. Appellant was a professional in the securities industry while the others were not. Appellant's defense was that his trades were based on information available to such a professional. The other tippees' information may well have been entirely limited to Stephanou's tips, a fact not easily litigated.

However, the relevance of the other trades is not limited to showing the motive for appellant's trades. Appellant challenged Stephanou's testimony as to his conversations with appellant, labeling him a "career criminal" and "a master liar" who concocted a tale involving appellant to obtain a lighter sentence.

Appellant's defense was not that he received information from Stephanou about the ABS negotiations and that it was both insignificant and a fraction of the information available to him. Rather, appellant denied ever receiving any information from Stephanou regarding any transaction on which Stephanou was working. Given that testimony and litigating position, the evidence of common trades had arguable probative value in support of the credibility of Stephanou's testimony that he shared common information with appellant and the others.

Admission of the evidence of other trades was thus a paradigmatic case of weighing probative value and danger of unfair prejudice that was within the considerable discretion of the district court. It may well be that appellant was entitled

16

to a limiting instruction, but such an instruction was never requested.

c)  Order of Forfeiture

The final issue is whether the district court erred in ordering appellant to forfeit $12.65 million, the total amount of profits made, and losses avoided, by the Fund in ABS trades. Appellant, who was an employee and small equity owner of the Fund, argues that he cannot be ordered to forfeit profits that he never received or possessed.  We agree.

In reviewing an order of forfeiture, we review the district court's legal conclusions de novo and the factual findings for clear error.  United States v. Sabhnani, 599 F.3d 215, 261 (2d Cir. 2010). In the course of successful criminal securities fraud prosecutions, a district court can order the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [the] violation."[2]  The definition of proceeds for insider trading violations is "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs

---

[2] 18 U.S.C. § 981(a)(1)(C).  Section 981(a)(1)(C) allows a court to order forfeiture for "any offense constituting 'specified unlawful activity' []as defined in [18 U.S.C. §] 1956(c)(7)."  Section 1956(c)(7)(A) incorporates "any act or activity constituting an offense listed in [18 U.S.C. §] 1961(1)." And § 1961(1)(D) lists "any offense involving . . . fraud in the sale of securities."  While § 981(a)(1)(C) is a civil forfeiture provision, it has been integrated into criminal proceedings via 28 U.S.C. § 2461(c).  This roundabout statutory mechanism allows a court to order forfeiture in criminal securities fraud proceedings.

incurred in providing the goods or services."[3]

While the statute does not expressly identify the "whom" that must do the acquiring that results in forfeiture, "forfeiture" is a word generally associated with a person's losing an entitlement as a penalty for certain conduct. <u>See</u> <u>Hamilton v. Atlas Turner, Inc.</u>, 197 F.3d 58, 61 (2d Cir. 1999) (discussing the difference between forfeiture and waiver). The order in the present matter includes funds to which appellant was never entitled. Because the "proceeds" sought by the government here were "acquired" by the Fund over which

---

[3] <u>Id.</u> § 981(a)(2)(B). We agree with our own prior non-precedential conclusion, consistent with that of the Tenth Circuit, that § 981(a)(2)(B) supplies the definition of "proceeds" in cases involving fraud in the purchase or sale of securities, <u>see United States v. Mahaffy</u>, No. 09-5349-cr, 2012 U.S. App. LEXIS 16072 at *58-59 (2d Cir. August 2, 2012) ("If the district court addresses the forfeiture issue again, with the same factual and legal bases, the proper measure of forfeiture . . . is . . . under § 981(a)(2)(B)."); <u>United States v. Nacchio</u>, 573 F.3d 1062, 1088-90 (10th Cir. 2009), and incorporate by reference the rationale contained therein. Section 981(a)(2)(B) applies to "cases involving lawful goods or lawful services that are sold or provided in an illegal manner." A security is a "lawful good[]" for the purposes of § 981(a)(2)(B), the purchase or sale of which, if done based upon improperly obtained material nonpublic inside information, is "sold . . . in an illegal manner." Further, the sale of a security is not an inherently unlawful activity, like say the sale of foodstamps, or a robbery, and thus insider trading is not "unlawful activity" as that term is used in § 981(a)(2)(A). <u>See</u> 1 David B. Smith, Prosecution and Defense of Forfeiture Cases, ¶ 5.03[2], at 5-62 ("The term 'unlawful activities' in section 981(a)(2)(A) was meant to cover inherently unlawful activities such as robbery that are not captured by the words 'illegal goods' and 'illegal services.'"). <u>United States v. Uddin</u>, 551 F.3d 176 (2d Cir. 2009) is not to the contrary. That case involved the sale of foodstamps, which cannot be done lawfully, and therefore is properly considered an "unlawful activity" under § 981(a)(2)(A). Because § 981(a)(2)(B) defines "proceeds" as the "money acquired . . . less the direct costs incurred" it seems that the only money that should be subject to forfeiture in an insider trading case is money acquired when shares are traded based upon inside information at a gain. In cases where the securities are sold at a loss to avoid further losses, the direct costs associated with the sale, namely the cost of purchasing the securities sold, would exceed the "money acquired" in the sale. In this case, because the Fund and not appellant bore all direct costs, any money that appellant can fairly be considered as having "acquired" as a result of his insider trading activities may be subject to forfeiture under §981.

appellant lacks control, it is difficult to square the statute with the forfeiture order.

Forfeiture of funds or property can be either civil or criminal. In civil forfeiture, the United States brings a civil action against the property itself as an in rem proceeding -- "[i]t is the property which is proceeded against, and . . . held guilty and condemned as though it were conscious instead of inanimate and insentient." Various Items of Personal Property v. United States, 282 U.S. 577, 581 (1931); see also United States v. Davis, 648 F.3d 84, 92 (2d Cir. 2011) (quoting same). In civil forfeiture proceedings, the burden often rests on the claimant, who may be an innocent third party, to prove that the property is not subject to forfeiture. United States v. Parcel of Property, 337 F.3d 225, 229-30 (2d Cir. 2003). The claimant's culpability is also often irrelevant, Bennis v. Michigan, 516 U.S. 442, 446 (1996).

Forfeiture in criminal proceedings under 18 U.S.C. § 981 is an in personam proceeding. "The forfeiture serves no remedial purpose, is designed to punish the offender, and cannot be imposed upon innocent owners." United States v. Bajakajian, 524 U.S. 321, 332 (1998). Criminal forfeiture focuses on the disgorgement by a defendant of his "ill-gotten gains." United States v. Kalish, 626 F.3d 165, 170 (2d Cir. 2010) (citing United States v. Emerson, 128 F.3d 557, 566 (7th Cir. 1997); United States v. Various Computers & Computer

19

Equip., 82 F.3d 582, 588 (3d Cir. 1996)).  Thus, the calculation of a forfeiture amount in criminal cases is usually based on the defendant's actual gain.  See United States v. McGinty, 610 F.3d 1242, 1247 (10th Cir. 2010) ("[R]estitution is calculated based on the victim's loss, while forfeiture is based on the offender's gain." (quoting United States v. Webber, 536 F.3d 584, 603 (7th Cir. 2008))).  This is consistent with the purpose of criminal forfeiture, as endorsed by the House Judiciary Committee when recommending the Civil Asset Forfeiture Reform Act.  H.R. Rep. No. 106-192, at 5 (1999) ("With the forfeiture laws, we can separate the criminal from his profits. . . thus removing the incentive others may have to commit similar crimes tomorrow.") (quoting Stefan Cassella, Assistant Chief, Asset Forfeiture and Money Laundering Section, Criminal Division, U.S. Department of Justice in testimony before the committee); see also H.R. Rep. No. 105-358, at 23 (1997) (same).  District courts in our circuit have echoed this view by concluding that "a defendant may be ordered to forfeit all monies received by him as a result of the fraud."  United States v. Nicolo, 597 F. Supp. 2d 342, 347 (W.D.N.Y. 2009) (emphasis added) (citing United States v. Uddin, 551 F.3d 176, 181 (2d Cir. 2009)).

This general rule is somewhat modified by the principle that a court may order a defendant to forfeit proceeds received by others who participated jointly in the crime, provided the

actions generating those proceeds were reasonably foreseeable to the defendant. United States v. Fruchter, 411 F.3d 377, 384 (2d Cir. 2005) (reviewing order of forfeiture under RICO forfeiture provision); United States v. Warshak, 631 F.3d 266, 281-82, 333 (6th Cir. 2010) (affirming joint and several forfeiture orders under 18 U.S.C. § 981). This extends to forfeiture proceedings, where the general principle is that a defendant is liable for the reasonably foreseeable acts of his co-conspirators. See United States v. Jackson, 335 F.3d 170, 181 (2d Cir. 2003) ("Under well-established law, Jackson was responsible not only for the cocaine that he himself conspired to import but also for the cocaine his co-conspirators conspired to import, provided he knew of his co-conspirator's illicit activities or the activities were reasonably foreseeable by him."). The extension of forfeiture to proceeds received by actors in concert with a defendant may be deemed to be based on the view that the proceeds of a crime jointly committed are within the possessory rights of each concerted actor, i.e. are "acquired" jointly by them and distributed according to a joint decision. This view does not support an extension to a situation where the proceeds go directly to an innocent third party and are never possessed by the defendant.

Moreover, we are not aware of, and the government has not cited, any decision standing for the proposition that a defendant may be required to forfeit funds never acquired by

21

him or someone working in concert with him.  Neither our opinion in United States v. Royer, 549 F.3d 886 (2d Cir. 2008) nor our summary order in United States v. Capoccia, 402 F. App'x 639 (2d Cir. 2010) are to the contrary.  In neither case were we presented with a situation where a defendant had been asked to forfeit funds that were never under his or his co-conspirator's control.  While "property need not be personally or directly in the possession of the defendant, his assignees, or his co-conspirators in order to be subject to forfeiture," Capoccia, 402 F. App'x at 640, the property must have, at some point, been under the defendant's control or the control of his co-conspirators in order to be considered "acquired" by him. Finally, extending the scope of a forfeiture to include proceeds that have never been acquired either by a defendant or his joint actors would be at odds with the broadly accepted principle that forfeiture is calculated based on a defendant's gains.  See McGinty, 610 F.3d at 1247.  Therefore, we hold that the district court erred in ordering appellant to forfeit funds that were never possessed or controlled by himself or others acting in concert with him, and remand to determine the proper forfeiture amount.[4]

---

[4] To what extent appellant's interest in salaries, bonuses, dividends, or enhanced value of equity in the Fund can be said to be money "acquired" by the defendant "through the illegal transactions resulting in the forfeiture," 18 U.S.C. § 981(a)(2)(B), we leave to the district court to decide on remand in a manner not inconsistent with this opinion.

22

CONCLUSION

We have reviewed appellant's other arguments and conclude that they are without merit.  For the foregoing reasons, we affirm appellant's conviction, but vacate the order of forfeiture and remand for further proceedings in accordance with this opinion.