17-2373-cr(L)
*United States v. Walters*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2017

(Argued: May 29, 2018     Decided: December 4, 2018)

Docket Nos. 17-2373(L), 17-3169(Con), 17-3425(Con)

UNITED STATES OF AMERICA,

*Appellee*,

*v.*

WILLIAM T. WALTERS,

*Defendant-Appellant*,

THOMAS C. DAVIS,

*Defendant*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Before:     JACOBS and CHIN, *Circuit Judges*, and KUNTZ, *Judge*.[*]

---

[*]     Judge William F. Kuntz, of the United States District Court for the Eastern District of New York, sitting by designation.

Appeal from a judgment of conviction and orders of forfeiture and restitution entered in the United States District Court for the Southern District of New York (Castel, *J.*). Defendant-appellant was convicted, after a three-week jury trial, of securities fraud and related crimes. On appeal, he contends that his indictment should be dismissed because a special agent of the Federal Bureau of Investigation leaked confidential grand jury information to reporters in violation of the grand jury secrecy provision of Federal Rule of Criminal Procedure 6(e) and the Due Process Clause of the Fifth Amendment. Defendant-appellant also raises several other challenges to his conviction, as well as to the district court's forfeiture and restitution orders.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

Judge JACOBS concurs in a separate opinion.

BROOKE E. CUCINELLA, Assistant United States Attorney (Robert Allen, Michael Ferrara, Sarah K. Eddy, Assistant United States Attorneys, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, New York, *for Appellee*.

ALEXANDRA A.E. SHAPIRO (Eric S. Olney, Jacob S. Wolf, *on the brief*), Shapiro Arato LLP, New York, New

York, *and* Barry H. Berke, Paul H. Shoeman,
Kramer Levin Naftalis & Frankel LLP, New York,
New York, *for Defendant-Appellant.*

CHIN, *Circuit Judge*:

In this case, defendant-appellant William T. Walters, a professional sports gambler, was convicted, after a three-week jury trial, of securities fraud and related crimes based on his insider trading in shares of Dean Foods, Inc. ("Dean Foods") and Darden Restaurants, Inc. ("Darden"). Walters was sentenced principally to 60 months' imprisonment and a $10 million fine, and ordered to forfeit $25,352,490 and pay restitution of $8,890,969.33.

On appeal, Walters argues that the indictment in this case should be dismissed because of what he terms "extraordinary government misconduct" -- a special agent of the Federal Bureau of Investigation (the "FBI") leaked confidential grand jury information about the investigation to reporters from *The Wall Street Journal* (the "*Journal*") and *The New York Times* (the "*Times*"), in violation of the grand jury secrecy provision of Federal Rule of Criminal Procedure 6(e) and the Due Process Clause of the Fifth Amendment. Walters also challenges his conviction on the grounds that (1) the prosecution suborned perjury at trial and (2) there was insufficient evidence to support the counts of

3

conviction related to Darden. Finally, Walters contends that the district court erred in ordering restitution and forfeiture.

For the reasons set forth below, the judgment and order of forfeiture are **AFFIRMED**; the order of restitution is **VACATED**; and the case is **REMANDED** for the district court to reconsider restitution in light of the Supreme Court's decision in *Lagos v. United States*, 138 S. Ct. 1684 (2018).

## *BACKGROUND*

### A. *The Initial Investigation*

In July 2011, the FBI and the U.S. Attorney's Office (the "USAO" or the "Government") began an investigation into Walters for suspicious trading in shares of the Clorox Company ("Clorox").[1] In connection with the investigation, the Government issued approximately 30 grand jury subpoenas for phone records, bank records, trading records, and credit reports. Special Agent Matthew Thoreson was the FBI's primary case agent for the investigation. His supervisor was FBI Special Agent David Chaves.

---

[1] The Securities and Exchange Commission (the "SEC") was also investigating Walters's trading in Clorox. Pursuant to an "access request" by the USAO, the SEC shared with the USAO documents and information gathered through its parallel civil investigation.

4

On April 26, 2013, the Financial Industry Regulatory Authority ("FINRA") made a referral to the SEC of suspicious trading by Walters and others in Dean Foods stock shortly ahead of an August 2012 announcement that Dean Foods, a Dallas-based dairy and food company, intended to spin off its branded dairy business, WhiteWave. The SEC shared FINRA's referral with the USAO, and the revelation of Walters's close relationship with Thomas Davis, a member of Dean Foods's board of directors, caused the Government to broaden its investigation to include trading in Dean Foods and other companies. The Government issued grand jury subpoenas for Davis's phone records and accounts, and subpoenas for phone and account records for Walters and others in communication with him around the time of the Dean Foods trades.

Approximately one year into the investigation, on April 22, 2014, the Government received authorization to conduct a 30-day wiretap on Walters's cellphone. It received a second authorization for a 30-day wiretap on May 23, 2014. Shortly after the second authorization, however, the USAO learned that reporters planned to publish a story about the investigation.[2]

---

[2] The Government has represented that the FBI and USAO learned that a reporter knew details of the investigation in early May 2014, but neither office knew that an article would be published until May 27, 2014, at the earliest. Moreover, it has represented that following that notification in early May 2014, the FBI sought to

**B.**     *The News Articles*

On May 30, 2014, the *Journal* published an article revealing the existence of an insider trading investigation into Walters, Carl Icahn, and Phil Mickelson.  The *Times* followed with a story the same day.  Additional articles appeared in the *Times* on May 31 and in the *Journal* on June 1.  The articles contained detailed confidential information about the investigation and attributed the information to "people briefed on the matter" who "spoke anonymously because they were not authorized to discuss the investigation." App. 78-83, 318-20.  The articles disclosed details about when the investigation began, who the targets were, which stocks were traded, what specific trades were being investigated, when those trades took place, what evidence was being examined, which investigative techniques were being employed by investigators, and which "theor[ies]" the Government was "exploring," including, *e.g.*, that an inside source gave Walters a heads-up about Dean Foods's plan to spin off WhiteWave.  App. 78-99, 321-24.

---

dissuade the reporter from publishing the story, including by agreeing to meet with the newspaper staff on May 27, 2014.  The USAO does not appear to have participated in that meeting.

Throughout June 2014, several follow-up articles appeared in the *Journal* and the *Times*. The articles discussed ongoing details of the investigation into Walters, including information about subpoenas issued to Dean Foods. The articles reported that, for example, federal prosecutors had requested documents from Dean Foods, and certain targets of the broader investigation "ha[d] not received any subpoenas from the authorities." App. 92, 94. The June articles also attributed information about the investigation to "people briefed on the probe." App. 91. The last article at issue, which was published by the *Journal* on August 12, 2015, identified Davis as a target of the investigation.

## C. *The News Leaks*

As discussed further below, it was eventually revealed that from April 2013 through June 2014, FBI Special Agent Chaves had provided information about the investigation to as many as four reporters from the *Times* and the *Journal*.

Specifically, in later interviews, Chaves admitted that in April 2013 he had met with two reporters from the *Times* for dinner and discussed the investigation into Clorox, mentioning Walters by name. Moreover, Chaves stated that he had met with a reporter from the *Journal* in late 2013 and asked her

7

"to let him know if she came across any information regarding Walters." App. 221. Chaves also acknowledged having dinner with three reporters from the *Times* in April 2014 in which the investigation was discussed, including the expansion of the investigation to trading in stocks other than Clorox.

The USAO and FBI learned about the media's intention to publish an article in early May 2014. Specifically, on May 6, 2014, a *Times* reporter invited J. Peter Donald, then an FBI New York Field Office media representative, to meet for coffee and stated that she planned to publish a piece on the investigation. On May 8, 2014, the FBI informed the USAO that the *Journal* also planned to publish an article.

On May 13, 2014, Donald spoke with other persons at the *Journal* who agreed to hold the story about the investigation until at least May 22, 2014. Sometime after that conversation on May 13, it appears that the FBI and USAO discussed available options for getting the newspapers to continue to hold their stories, and that ultimately, on May 27, 2014, Chaves, Donald, and several other FBI agents participated in a meeting with the *Journal*. Two agents, including Chaves, insist that others besides him disclosed "various aspects of the investigation" in exchange for the *Journal* agreeing to hold publication. The

8

remaining three agents deny this, although one *Times* reporter told the USAO that he had multiple "sources" about the investigation.  App. 220.

In a May 28, 2014 email to Chaves, Special Agent Thoresen wrote, in reference to learning that reporters had detailed information about the Walters investigation:  "Whomever is leaking[] apparently has a specific and aggressive agenda in that they are now going to other media outlets in an effort to derail this investigation."  App. 229.

On May 30, 2014, the day the first *Journal* and *Times* articles were published, George Venizelos, the Assistant Director in Charge of the New York Field Office, emailed Donald, Chaves, and others, asking how the reporter had learned certain information and instructing FBI personnel to cease any contact with the reporter, stating that if he found out anyone continued to speak to the reporter, "there will be reassignments immediately."  App. 231.

After the May 31, 2014 *Journal* article was published, Thoresen forwarded the article to the Assistant United States Attorney ("AUSA") responsible for the investigation, describing the article as "[d]eplorable and reprehensible."  App. 235.

On June 1, 2014, the U.S. Attorney at the time, Preet Bharara, also forwarded a link to a second *Journal* article to Venizelos, stating "I know you agree these leaks are outrageous and harmful." App. 236. Venizelos then emailed Donald, Chaves, and others, stating that the articles were "now an embarrassement [sic] to this office," and instructing them to meet with him to discuss the issue the next morning. App. 236.

On June 2, 2014, Venizelos met with FBI personnel, expressed anger over the leaks, and again instructed agents to cease contact with the media. Despite Venizelos's directive, however, Chaves appears to have communicated with reporters about the investigation sometime between June 2 and June 11, 2014, though he switched to using his personal cell phone and deleted his personal email account. As noted above, the articles continued into 2015.

**D.** *The Indictment*

In February 2016, Davis advised the Government that he wished to cooperate, and, in meeting with the Government, he quickly implicated Walters. On May 16, 2016, he pled guilty, pursuant to a cooperation agreement, to a 12-count information. On May 17, 2016, the very next day and almost two years after the first articles were published, the USAO and the FBI presented evidence

to a grand jury that Walters had communicated with and received inside information from Davis prior to his purchase or sale of large quantities of Dean Foods stock and those trades resulted in significant profits or avoided losses when news about the company later became public.[3] To support its theory, the Government presented summaries of Walters's trading and phone records, along with information drawn from contemporaneous Dean Foods board meeting minutes and earnings announcements. The grand jury also heard a summary of Davis's expected trial testimony, which was to include, among other things, that Davis had provided Walters with material nonpublic information about Dean Foods along with another company, Darden; made false statements to prosecutors; intentionally destroyed a burner cellphone (referred to at trial as the "bat phone") that Davis used to communicate material nonpublic information to Walters; and entered into a cooperation agreement with the Government pursuant to which he pled guilty.

The grand jury returned a 10-count indictment the same day, charging Walters with conspiracy, securities fraud, and wire fraud related to

---

[3] The Government submitted to the district court a transcript of the grand jury testimony leading to Walters's indictment.

insider trading in Dean Foods and Darden. Walters was arrested on

May 18, 2016.

**E.** *Motion for Hearing on the News Leaks*

On September 23, 2016, Walters filed a motion for a hearing on the

issue of the news leaks. In his motion, Walters argued that the content of the

news articles made clear that the Government must have improperly leaked

grand jury information to reporters in violation of the grand jury secrecy

provision, Federal Rule of Criminal Procedure 6(e).[4] Walters alleged that the

Government leaked this information "as part of a concerted effort to breathe life

into a flagging investigation." App. 108. On October 21, 2016, the Government

opposed the motion on the basis that Walters had failed to show a Rule 6(e)

violation. First, the Government argued that the articles did not necessarily

include "matters occurring before the grand jury" because the articles did not

---

[4] Rule 6(e) provides in relevant part that certain persons, including government attorneys, "must not disclose a matter occurring before the grand jury." Fed. R. Crim. P. 6(e)(2)(B)(vi). A government attorney may disclose grand jury matters to "any government personnel . . . that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce criminal law," *id.* at r. 6(e)(3)(A)(ii), in which case the person to whom disclosure is made is also bound by the secrecy requirement, *id.* at r. 6(e)(2)(B)(vii). The Government agrees that these provisions bar a government agent, including an FBI agent, from disclosing matters occurring before the grand jury.

12

contain any information from the referenced records or subpoenas and at least some of the information was public or not protected by the grand jury secrecy provisions. App. 186, 202-05. Second, the Government argued that Walters could not show that the source of the information was a Government agent or attorney: "None of the articles linked a source directly to the Government," Government representatives declined to comment, and civil regulators and others -- who are not bound by Rule 6(e) -- also had access to the information contained in the articles. App. 206-09. According to the Government, the "natural and logical inferences lead to the conclusion that the source was not a Government official." App. 209.

The district court issued an order on November 17, 2016, directing the parties to prepare for an evidentiary hearing to determine whether there had been communications between FBI agents or AUSAs involved in the investigation and reporters or employees of the *Journal* and *Times* from April 1 to June 30, 2014. In response to the court's directive, the Government identified 14 agents and AUSAs whom it intended to interview in connection with the news leaks. The Government also obtained emails, cell phone logs, and text messages for those individuals for the time period specified by the court.

On December 16, 2016, a few days before the scheduled hearing, the Government submitted an *ex parte* letter to the court under seal in which it informed the district court that it had conducted an internal inquiry and that, contrary to its earlier position, it had learned that an FBI agent -- Chaves -- was the media's source of confidential information about the investigation.[5] The Government acknowledged that "[i]t is now an incontrovertible fact that FBI leaks occurred, and that such leaks resulted in confidential law enforcement information about the Investigation being given to reporters." App. 217.[6] It represented that Chaves had been referred by the FBI to its Office of Professional Responsibility and by the USAO to the Office of Inspector General for the Department of Justice ("DOJ") for his misconduct.[7]

---

[5] The letter set forth the Government's findings, based on interviews and contemporaneous communications within the FBI and USAO. The Government later filed the letter on the public docket in redacted form. See D. Ct. Dkt No. 65.

[6] The district court later noted that "[w]hile the government's artful opposition to Walters' initial motion contained no affirmative statements that were false, it confined itself to denials from limited sources and never disclosed high level concerns over FBI leaks." Sp. App. 20. The leaks and concerns, as expressed in emails in May and June 2014, were only later revealed to the district court in the Government's *ex parte* letter in December 2016.

[7] Specifically, the Government revealed that on December 6, 2016, it had interviewed Chaves with FBI counsel present, and Chaves admitted to providing confidential information about the investigation to the *Journal* and *Times* dating back to in or about April 2013. On December 8, 2016, Chaves was again interviewed. Before the third interview scheduled for December 13, 2016, however, Chaves retained

In its letter, the Government provided the district court with a detailed chronology, summary of findings, and contemporaneous internal emails relating to the leaks. It explained, however, that because "much about the scope and content of the information that Chaves leaked to reporters remains unclear," App. 219, it believed "that the appropriate course is for the Court to assume that a Rule 6(e) violation occurred and proceed to consider the issue of remedy," App. 218.

In light of the Government's letter, the district court indicated it would presume a Rule 6(e) violation occurred and cancelled the hearing.

## F. *Motion to Dismiss the Indictment*

On January 13, 2017, Walters moved to dismiss his indictment on the bases that (1) he was prejudiced by the leaks because they caused Davis to cooperate against him; (2) even absent a showing of prejudice, the indictment should be dismissed because the leaks involved "systematic and pervasive" prosecutorial misconduct; and (3) the Government's conduct was so "outrageous" that it violated the Due Process Clause of the Fifth Amendment. App. 240.

---

personal counsel, and informed the Government that he would no longer meet and would assert his Fifth Amendment privilege against self-incrimination.

15

The district court denied the motion in a written decision on March 1, 2017. First, it held that Walters's contentions as to prejudice amounted to "sheer speculation" because "there is no reason to think that Davis would not have been indicted" in the absence of the government misconduct and articles. Sp. App. 13-14. Second, the court rejected Walters's argument that he was not required to show prejudice because the misconduct at issue was "systematic and pervasive," noting that the court was "not aware of any case in which an indictment was dismissed" on such grounds. Sp. App. 17. Third, the court rejected Walters's due process argument on the basis that the doctrine was inapplicable to his case and that "[t]he proper remedy here is to investigate and, if appropriate, prosecute the offender, rather than dismiss the indictment." Sp. App. 19.

Finally, the district court concluded that an evidentiary hearing was unnecessary because "Chaves has indicated that he will refuse to answer questions," and "[i]n any event, the Court has been provided sufficient evidence . . . to make a ruling." Sp. App. 16. On March 1, 2017, the district court issued an order requiring the Government to submit information on a quarterly basis on

16

the status of the investigation into Chaves's misconduct.  *See* March 1, 2017

Memorandum and Order, D. Ct. Dkt No. 104, at 2.

**G.** *Trial*

Trial began on March 15, 2017, and lasted approximately three

weeks.  The evidence included documents and testimony that established that

Walters had repeatedly conspired with Davis to commit insider trading from

2008 through 2014.  Specifically, the evidence demonstrated that Davis would

receive material nonpublic information about Dean Foods, closely followed by a

phone call from Davis to Walters, closely followed by Walters initiating

purchases or sales of Dean Foods stock.  Davis testified that, in 2013, he had also

tipped Walters about a plan by Barington Capital ("Barington") to acquire

Darden, and he passed that information on to Walters expecting that he would

trade on it.  The evidence further showed that, in exchange for Davis's tips,

Walters provided Davis with nearly $1 million in personal loans, which Davis

never fully repaid.

Davis also testified that Walters had provided him with a disposable

cell phone in 2011, the "bat phone," to be used for communications related to

17

Dean Foods and that he had disposed of the "bat phone" in a body of water in May 2014. The phone was never recovered.

On April 7, 2017, the jury returned a verdict of guilty on all counts.

## H.    *Sentence*

On July 27, 2017, Walters was sentenced principally to 60 months' imprisonment and a $10 million fine. The court also ordered Walters to pay restitution and forfeiture in an amount to be determined at a later date, following additional briefing from the parties. On September 20, 2017, the district court ordered Walters to forfeit $25,352,490, and on October 20, 2017, Walters was ordered to pay restitution of $8,890,969.33, including $8,882,022.80 to Dean Foods.

## I.    *Motion for a New Trial*

After his conviction, Walters filed a Rule 33 motion for a new trial, arguing that the Government had knowingly suborned perjured testimony by Davis about the circumstances of his receipt of the "bat phone" from Walters. Sp. App. 21.

On July 6, 2017, the district court denied the motion, holding that (1) Walters had failed to show Davis had committed perjury; (2) even assuming

an inconsistency in the testimony, it was "more likely" that Davis had misremembered or confused the circumstances surrounding the receipt of the "bat phone" from Walters, Sp. App. 25; (3) even if Davis had committed perjury, it would have been immaterial, as Davis's testimony simply corroborated the "overwhelming circumstantial evidence" of insider trading," Sp. App. 27; (4) there was "no reason to suspect that the government believed Davis to be lying rather than simply misremembering events," Sp. App. 27; and (5) both parties had identified inconsistencies to the jury and the jury had rejected Walters's argument.

This appeal followed.

### *DISCUSSION*

Walters argues that (1) the indictment should be dismissed because of the grand jury leaks; (2) the jury's verdict should be set aside because the Government suborned perjury and the evidence was insufficient to support a conviction; and (3) the district court erred in its restitution and forfeiture orders. We address each argument in turn.

**I.** *Dismissal of the Indictment*

It is undisputed that Chaves's leaks to reporters violated the grand jury secrecy provision of Federal Rule of Criminal Procedure 6(e). The principal question is whether dismissal of the indictment is appropriate in these circumstances.

First, Walters argues that the indictment should be dismissed pursuant to the court's supervisory authority because he was prejudiced by the leaks because they (1) "revived" a "dormant" investigation and (2) "precipitated [Davis's] cooperation." Def.-App. Br. at 40-41. Second, he argues that, even absent a showing of prejudice, the indictment should be dismissed as a matter of due process because this case involves "a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process." Def.-App. Br. at 38 (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 259 (1988)). Third, he contends, in the alternative, that the case should be remanded to the district court for an evidentiary hearing.

The parties disagree as to the standard of review on appeal from a district court's denial of a motion to dismiss an indictment for governmental

misconduct: Walters argues that it is *de novo* while the Government contends that it is abuse of discretion.  We have held, however, that a motion to dismiss an indictment "alleging outrageous governmental conduct is a question of law directed to the trial judge and review of rulings thereon is *de novo*." *United States v. Cuervelo*, 949 F.2d 559, 567 (2d Cir. 1991); *accord United States v. Vilar*, 729 F.3d 62, 79 (2d Cir. 2013) ("We review *de novo* the denial of a motion to dismiss the indictment."); *United States v. Yousef*, 327 F.3d 56, 137 (2d Cir. 2003) ("We review a district court's decision denying a motion to dismiss an indictment *de novo*.").[8] We review a district court's factual findings for clear error.  *Yousef*, 327 F.3d at 137.  We review a district court's denial of an evidentiary hearing for abuse of discretion.  *CSX Transp. Inc. v. Island Rail Terminal, Inc.*, 879 F.3d 462, 467 (2d Cir. 2018).

---

[8]    To support its position that an abuse of discretion standard applies, the Government relies primarily on a 1978 decision where we held that the district court abused its discretion in not dismissing an indictment because of misconduct by employees of the SEC in attempting to settle a related civil action, *United States v. Fields*, 592 F.2d 638, 646-47 (2d Cir. 1978), and a non-precedential summary order, *United States v. Palmisano*, No. 96-1142, 1996 WL 680774, at *3 (2d Cir. Nov. 22, 1996).  *Fields* did not discuss which standard of review was appropriate and cited no authority, and *Palmisano* relied solely on *Fields*.  Moreover, the Government acknowledges that denial of a motion to dismiss on due process grounds is reviewed *de novo*.  *See United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991).

**A.** *The Court's Supervisory Authority*

**1.** *Applicable Law*

A district court may exercise its supervisory authority to dismiss an indictment for Rule 6(e) violations. *See Bank of Nova Scotia*, 487 U.S. at 254-55. Dismissal is not appropriate, however, "unless . . . errors prejudiced the defendant[]." *Id.* at 254; *see also United States v. Eisen*, 974 F.2d 246, 261 (2d Cir. 1992) ("[A] defendant seeking reversal or a hearing regarding alleged grand jury abuse must show prejudice or bias."); *United States v. Friedman*, 854 F.2d 535, 584 (2d Cir. 1988) (concluding that dismissal of an indictment is inappropriate where a defendant "simply cannot show resultant prejudice").

In the Rule 6(e) context, "[t]he prejudicial inquiry must focus on whether any violations had an effect on the grand jury's decision to indict." *Bank of Nova Scotia*, 487 U.S. at 255. Accordingly, dismissal is appropriate "only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id.* at 256 (quoting *United States v. Mechanik*, 475 U.S. 66, 78 (1986) (O'Connor, *J.*, concurring)).

**b)**     *Application*

We start by recognizing that the conduct of the FBI agent in this case was highly improper. "[T]he proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979). The leaking of confidential grand jury information to members of the press, whether to satisfy public interest in high profile criminal prosecutions or to generate evidentiary leads, is serious misconduct and, indeed, likely criminal. *See, e.g., United States v. Ellerman*, No. 07-cr-00080-JSW (N.D. Cal. July 13, 2007) (sentencing defendant, a defense lawyer, for contempt, making a false declaration, and obstruction of justice for leaking grand jury information to the press); *Commonwealth v. Kane*, 188 A.3d 1217, 1221-25 (Pa. Super. Ct. 2018) (affirming conviction of state attorney general, who was sentenced to 10 to 23 months' imprisonment, for charges related to leaking grand jury information to the press); *see also United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 425 (1983) ("[G]overnment attorneys and their assistants[] and other personnel attached to the grand jury are forbidden to disclose matters occurring before the grand jury."); *United States v. Girardi*, 62 F.3d 943, 944 (7th Cir. 1995) (affirming sentence of 97 months for grand juror who leaked grand

23

jury information to a friend and others). Even the then-U.S. Attorney characterized the leaks here as "outrageous." App. 236.

Nevertheless, dismissal of the indictment is not appropriate in this case. Walters has not demonstrated that he was prejudiced by Chaves's actions, that is, that the violations "substantially influenced the grand jury's decision to indict" or that "there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (internal quotation marks omitted); *see id.* at 254 (explaining that a court "exceeds" its supervisory powers when it dismisses an indictment for prosecutorial misconduct not prejudicial to the defendant). We agree with the district court that Walters's asserted claims of prejudice -- that the news leaks revived a "dormant investigation" and precipitated Davis's cooperation -- are contravened by the record or wholly speculative.

First, the record does not support the assertion that the investigation was "dormant" when Chaves began leaking information in April 2013. Chaves began to leak information around the time that FINRA referred suspicious trading in Dean Foods to the SEC, and that referral prompted the Government to expand its criminal investigation. Additionally, in April 2014, the Government

24

received authorization to intercept calls to Walters's cellphone to gather evidence. The articles at issue were not published until May and June 2014. While Chaves suggested in his December 2016 interview that the investigation was dormant, the record establishes that the investigation was in fact active and ongoing when he leaked information. In fact, the leaks and resultant articles impeded the investigation as the FBI determined that "further covert surveillance was useless." Sp. App. 5.

Second, we agree with the district court that attributing Davis's cooperation to the news leaks is "sheer speculation" and "not . . . any basis to conclude that the newspaper articles had any impact whatsoever on the grand jury's decision to indict." Sp. App. 14. Davis did not decide to cooperate until "approximately six months after the publication of the last article which [Walters] contends contained leaked information." Sp. App. 9. Moreover, Davis was cross-examined extensively at trial about his motivation to cooperate and stated that he did so because "it was pretty clear, based on advice from counsel, that [he] was highly likely to get indicted in the next couple of months" because of evidence uncovered during the investigation. Gov. Br. at 33 (quoting Tr. 910). There simply is "no reason to think Davis would not have been indicted" or that he

25

would not have decided to plead guilty and cooperate with authorities had the articles not been published.  Sp. App. 13.

The lack of prejudice in this case is further underscored by the fact that Walters received a full and fair trial in which there was overwhelming evidence to support his conviction.  *See Mechanik*, 475 U.S. at 71-73 (holding that a petit jury's guilty verdict rendered harmless any error in the grand jury proceeding and that dismissal of the indictment after conviction would result in excessive social and economic costs); *see also* Sp. App. 28 (district court observing: "[T]his is not a case where there is 'a real concern that an innocent person may have been convicted.'" (quoting *United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015))).  Indeed, to dismiss the indictment here absent prejudice would constitute a "punishment of society for [the] misdeeds" of an errant FBI agent.  *United States v. Myers*, 510 F. Supp. 323, 327 (E.D.N.Y. 1980) (quoting *United States v. Stanford*, 589 F.2d 285, 299 (7th Cir. 1978)); *accord United States v. Brito*, 907 F.2d 392, 394 (2d Cir. 1990) (explaining that the "social costs of dismissing an indictment because of an imperfect grand jury proceeding are simply too high . . . when the defendant has been convicted after a full and fair trial and no harm has been done").

Accordingly, we conclude that dismissal of Walters's indictment is not appropriate on this basis.

## B.    *Due Process*

Unable to demonstrate prejudice, Walters argues that the indictment should nevertheless be dismissed because the Rule 6(e) violations were "so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process" resulting in his indictment.  *Bank of Nova Scotia*, 487 U.S. at 259.  Alternatively, Walters argues that Chaves's conduct was so "outrageous" that it violated "common notions of fairness and decency."  Def.-App. Br. at 44-45 (quoting *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997)).

### 1.    *Systematic and Pervasive Misconduct*

#### a)    *Applicable Law*

In *Bank of Nova Scotia*, the Supreme Court recognized a class of cases in which indictments may be dismissed "without a particular assessment of the prejudicial impact of the errors" because the grand jury "errors are deemed fundamental."  *Bank of Nova Scotia*, 487 U.S. at 256.  The Court explained that prejudice may be presumed in such cases because "the structural protections of the grand jury have been so compromised as to render the proceedings

27

fundamentally unfair." *Id*. at 257. The Court made clear, however, that these cases are "isolated exceptions" to the prejudice requirement that involve, for example, racial discrimination or the exclusion of women in the selection of grand jurors. *Id.* at 256-57 (citing *Vasquez v. Hillery*, 474 U.S. 254, 260-64 (1986) (racial discrimination), and *Ballard v. United States*, 329 U.S. 187 (1946) (exclusion of women)).

In distinguishing *Bank of Nova Scotia* from cases involving "fundamental" error, the Court noted that it was "not faced with a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment." *Id.* at 259. We have observed, based on this language, that a history of "systematic and pervasive" prosecutorial misconduct may "possibly" support the dismissal of an indictment. *Brito*, 907 F.2d at 394.

**b.** *Application*

As a threshold matter, it is not clear that the Supreme Court created a stand-alone exception to the prejudice requirement for cases involving systematic and pervasive prosecutorial misconduct. *See id.*; *Friedman*, 854 F.2d at

582 (explaining that "no matter how pervasively the rules concerning grand jury secrecy" were violated, those violations would not warrant dismissal absent a showing of prejudice); *United States v. Blaszczak*, No. 17-CR-357, 2018 WL 1322192, at *6 (S.D.N.Y. Mar. 12, 2018) (explaining that the court "does not read *Bank of Nova Scotia* as instructing that the question of prejudice may be discarded" in case involving a motion to dismiss an indictment based on systematic and pervasive government misconduct).  The portion of *Bank of Nova Scotia* upon which Walters relies is prefaced by the following:  "*[W]e note that we are not faced with* a history of prosecutorial misconduct, spanning several cases, that is so systematic and pervasive as to raise a substantial and serious question about the fundamental fairness of the process which resulted in the indictment." *Bank of Nova Scotia*, 487 U.S. at 259 (emphasis added).  We are not aware of any court that has applied this dicta from *Bank of Nova Scotia* to dismiss an indictment.

Even assuming an indictment could be dismissed on this basis, we are not persuaded that dismissal would be appropriate in this case.  As discussed above, the Supreme Court gave only two examples where grand jury errors were "deemed fundamental" and prejudice was presumed: racial discrimination in the

29

selection of grand jurors and the exclusion of women from the grand jury. The Court explained that, in the face of such discrimination, "it could be presumed that a discriminatorily selected grand jury would treat defendants unfairly" and any inquiry into prejudice "would have required unguided speculation." *Id.* at 257. The conduct here does not warrant a presumption of prejudice, and the prejudice -- if any -- can be ascertained without "unguided speculation." *Cf. Friedman*, 854 F.2d at 582 (explaining that "no matter how pervasively the rules concerning grand jury secrecy were violated," the violations would not warrant dismissal absent a showing of prejudice); *United States v. Silver*, 103 F. Supp. 3d 370, 380 (S.D.N.Y. 2015) (explaining that, in the context of potentially improper pre-indictment statements made by the U.S. Attorney to the press, "the grand jury is 'not confined to a passive role'" and absent a showing of prejudice, the grand jury "presumptively has access to the media without being prejudiced" (quoting *United States v. Nunan*, 236 F.2d 576, 593-94 (2d Cir. 1956)).

Walters argues that there was systematic and pervasive prosecutorial misconduct here because the leaks went on for two years, Chaves had leaked similar information in other white-collar criminal cases, and other

members of the FBI and the USAO were complicit in leaking the information and covering the leaks up.

Chaves's misconduct is deeply troubling, and the decision to forgo a hearing prevents us from understanding if there were other cases like this one.[9] But the violations in this case do not raise a substantial and serious question about the fundamental fairness of the process that resulted in Walters's indictment. Nor are we persuaded that representatives of the USAO or other members of the FBI were complicit. As the district court concluded, "[n]o evidence has been presented indicating that others besides Chaves were illegally sharing information with the press." Sp. App. 19. Moreover, when the articles came to light at the end of May 2014, the U.S. Attorney immediately emailed the Assistant Director of the FBI's New York Field Office to express concern.

Finally, Walters argues that the Government misled the district court about the leaks, pointing to the Government's assertions in its October 2016 opposition to Walters's motion that Walters "cannot show that the source of the information was an agent or attorney for the Government." Def.-App. Br. 18 (quoting Gov't Mem. of Law in Opp. to Def. Motion at 52-53). With the benefit of

---

[9] Although the issue was raised below, the district court made no findings as to whether Chaves had in fact leaked information in prior cases.

hindsight, it is evident that the Government should have conducted a more thorough investigation prior to its initial response to the district court. Nevertheless, while the district court found the Government's denials to be "artful," it also concluded that the Government had made "no affirmative statements that were false." Sp. App. 20. The district court, of course, was much closer to the situation then we are, and we defer to its findings. Moreover, prompted by the district court's November 17, 2016 order, the Government did conduct a more thorough investigation and determined -- and promptly disclosed -- that Chaves "was a significant source of confidential information regarding the Investigation for the *Times* and *Journal*." App. 217.

Accordingly, dismissal of the indictment pursuant to the court's supervisory power is not appropriate on this basis.

We note that our conclusion is reinforced by the availability of remedial measures short of dismissal. As this Court has repeatedly emphasized, the exercise of a court's supervisory authority to dismiss an indictment is a "drastic remedy" that should be utilized with caution and only in extreme cases. *United States v. Brown*, 602 F.2d 1073, 1076 (2d Cir. 1979) (internal quotation marks omitted). Indeed, "deterrence is an inappropriate basis for reversal where

means more narrowly tailored to deter objectional prosecutorial conduct are available." *Bank of Nova Scotia*, 487 U.S. at 255 (internal quotation marks omitted).

The district court therefore properly denied the motion to dismiss the indictment in favor of remedies that would not result in a "windfall" to Walters. *Id.* at 263; *see* Sp. App. 16 ("The proper remedy here . . . is to investigate and, if appropriate, prosecute the offender, rather than dismiss the indictment."). Chaves was publicly identified as the leaker and he has been referred to the FBI's Office of Professional Responsibility and the DOJ's Office of the Inspector General. The latter has opened a criminal investigation into his misconduct, the district court released the grand jury minutes, and the district court has required the Government to update the court on the status of the investigation on a quarterly basis. *See* March 1, 2017 Memorandum and Order, D. Ct. Dkt No. 104, at 2; *United States v. Helmsley*, 866 F.2d 19, 22 (2d Cir. 1988) (denying a request for a hearing but approving the referral of grand jury leaks for prosecution); *Bank of Nova Scotia*, 487 U.S. at 263 (explaining that Rule 6(e) errors may be "remedied adequately by means other than dismissal," including, *e.g.*, punishing the violation as a contempt of court, disciplining a prosecutor and requesting the bar or DOJ initiate disciplinary proceedings, and chastising the prosecutor in a

33

published opinion).  These remedies were sufficient to address the violations in this case.  *See Bank of Nova Scotia*, 487 U.S. at 263 (explaining that proper remedies for grand jury violations should "focus on the culpable individual rather than granting a windfall to the unprejudiced defendant").

### 2.      *"Outrageous" Governmental Misconduct*

To meet the "very heavy" burden of establishing a due process violation to dismiss an indictment for outrageous governmental misconduct, a defendant must show that the Government's conduct was "so outrageous that common notions of fairness and decency would be offended were judicial process invoked to obtain a conviction." *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (internal quotation marks omitted).  This inquiry "turn[s] on whether the governmental conduct, standing alone, is so offensive that it shocks the conscience." *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991) (internal quotation marks omitted).  Successful motions to dismiss on this ground have "[o]rdinarily" involved "coercion" or a "violation of the defendant's person." *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997); *see, e.g., Rochin v. California*, 342 U.S. 165, 172 (1952) (forcible extraction of accused's stomach contents); *Watts v. Indiana*, 338 U.S. 49, 55 (1949) (confession obtained after six days of intense

custodial interrogation); *Brown v. Mississippi*, 297 U.S. 278, 279 (1936) ("confessions shown to have been extorted by officers of the state by brutality and violence"). "Absent such extreme misconduct, relief in the form of reversal of a conviction is rare." *Schmidt*, 105 F.3d at 91; *see, e.g., United States v. Lard*, 734 F.2d 1290, 1296-97 (8th Cir. 1984) (holding defendant was entrapped into committing the crimes and adding that the government's conduct "approached being so outrageous" as to offend due process because "it was aimed at creating new crimes for the sake of bringing about criminal charges" where defendant, "before being induced, was lawfully and peacefully minding his own affairs" (internal quotation marks omitted)); *United States v. Myers*, 692 F.2d 823, 836-37 (2d Cir. 1982) (rejecting outrageous governmental conduct claim in Abscam case, where defendant alleged government agents violated due process by creating and instigating the crime); *United States v. Twigg*, 588 F.2d 373, 380-82 (3d Cir. 1978) (finding government conduct was outrageous where government "deceptively implanted the criminal design in [the defendant's] mind," "set him up, encouraged him, provided the essential supplies and technical expertise, . . . [and] assisted in finding solutions" when defendant encountered difficulties in consummating the crime).

We agree with the district court that this doctrine is not properly invoked here. *See* Sp. App. 19. Although the misconduct at issue is deeply disturbing and perhaps even criminal, it simply is not commensurate with the conduct in those cases where indictments were dismissed for coercion or violations of bodily integrity. *See United States v. Bout*, 731 F.3d 233, 239 (2d Cir. 2013) (affirming denial of motion to dismiss indictment on due process grounds and explaining that defendant "has not alleged anything akin to 'either coercion or a violation of [his] person'" (quoting *Al Kassar*, 660 F.3d at 121)). The Court certainly does not condone the conduct, but we are hard-pressed to conclude that the leaking by a government official of confidential information to the press "shocks the conscience." While there may be circumstances where strategic leaks of grand jury evidence by law enforcement rises to the level of outrageous conduct sufficient to warrant dismissal, those circumstances are not present here.

In any event, Walters's constitutional claim fails because he has not demonstrated prejudice in this case. *See Bank of Nova Scotia*, 487 U.S. at 256 (noting that harmless-error standard applies to constitutional errors as well as non-constitutional Rule 6 violations); *United States v. Stein*, 541 F.3d 130, 144 (2d Cir. 2008) ("Dismissal of an indictment is a remedy of last resort, and is

appropriate only where necessary to restore the defendant to the circumstances that would have existed had there been no constitutional error." (citation and internal quotation marks omitted)). The district court did not err in refusing to dismiss the indictment on this basis.

### C. *The Request for an Evidentiary Hearing*

Walters requests, in the alternative, that we direct the district court to conduct an evidentiary hearing to generate a more thorough record on the issue of the leaks and prejudice. The district court determined that a "further evidentiary hearing [was] not necessary" because it had sufficient evidence to rule on Walters's motion to dismiss the indictment and Chaves had asserted his Fifth Amendment rights and refused to answer any further questions. Sp. App. 16.

The district court did not abuse its discretion in denying Walters's request for an evidentiary hearing. Although "a hearing is the preferred course of action where disputed factual issues exist," we agree that a further hearing would not assist in the resolution of the issues raised by Walters's motion to dismiss. *Cuervelo*, 949 F.2d at 567.

First, the district court had a sufficient record on which to make its rulings. The Government conducted an internal inquiry in which it interviewed the 14 individuals connected to the investigation and collected relevant phone records, emails, and text messages. It also provided the court with a detailed summary of its findings, which included documents and a chronology of events. *See In re Grand Jury Subpoena*, 274 F.3d 563, 576 (1st Cir. 2001) (evidentiary hearing not required where the "paper record is quite extensive").

Second, Walters submitted multiple briefs and a declaration in response to the Government's letter and thus had a fair opportunity to challenge the Government's reported findings. *See id.* (explaining that "the key determinant" in whether a hearing is required "is whether, given the nature and circumstances of the case[,] the parties had a fair opportunity to present relevant facts . . . and . . . counter the opponent's submissions" (internal quotation marks and alterations omitted)).

Finally, as the district court disclosed the grand jury minutes and Chaves has refused to answer questions, we are not persuaded that a hearing could have further developed the record in any meaningful way. Accordingly, we decline to remand the case for an evidentiary hearing.

## II.    *The Evidence at Trial*

Walters raises two additional challenges to his conviction based on the evidence presented at trial.  First, he argues that the Government suborned perjury by introducing Davis's testimony regarding the "bat phone" used by Davis and Walters to communicate inside information.  Second, Walters argues that the evidence was insufficient to support his counts of conviction related to Darden.

As to Walters's argument that the Government suborned perjury, we review the district court's denial of Walters's Rule 33 motion on these grounds for abuse of discretion, and the factual findings in support of such a decision for clear error.  *See United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018).

A defendant claiming that his conviction should be reversed based upon allegations of perjured testimony must show:  "(i) the witness actually committed perjury, (ii) the alleged perjury was material, (iii) the government knew or should have known of the alleged perjury at time of trial, and (iv) the perjured testimony remained undisclosed during trial."  *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir. 2000) (internal quotation marks and citations omitted); *accord United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009).  Where

the Government was not aware of the perjury, the conviction must be set aside "only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991) (internal quotation marks and alteration omitted).

The district court determined that (1) inconsistencies in Davis's testimony about the "bat phone" were likely the result of misremembering or confusing the circumstances rather than lying; (2) even if Davis had committed perjury, Davis's testimony regarding the "bat phone" was immaterial in light of the "overwhelming circumstantial evidence" of Walters's guilt at trial, Sp. App. 27; (3) there was no reason to suspect the Government believed Davis to be lying; and (4) in any event, Walters was allowed to marshal sufficient evidence in support of his position that Davis was lying about the "bat phone", and the jury had ample opportunity to weigh the evidence and make a credibility determination. We conclude that the district court did not clearly err in its factual determinations or abuse its discretion in denying the motion. Accordingly, Walters's argument in this respect fails.

We review Walters's argument second argument -- that the evidence was insufficient to support the Darden counts -- *de novo*, and reverse only if a reasonable juror could not have found that the Government proved its case beyond a reasonable doubt. *See, e.g.*, *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012).

The evidence was sufficient to convict Walters of the counts related to insider trading in Darden. "[A] person violates [the securities laws] when he misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and uses that information in a securities transaction." *United States v. Falcone*, 257 F.3d 226, 230 (2d Cir. 2001) (quoting *United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991)). A defendant who acts upon a tip of inside information is equally liable if he had "knowledge that the tipper had breached the duty." *Id.* at 234.

At trial, Davis testified that, during the summer of 2013, he acquired material nonpublic information about a plan by Barington to acquire Darden and passed that information onto Walters expecting that Walters would trade on it. Specifically, Davis testified that, pursuant to a non-disclosure agreement, Barington shared with him at least one dealbook setting out its plan to buy a

large stake in Darden and that dealbook was marked "CONFIDENTIAL." Davis called Walters after a meeting during which Barington's investment plan was discussed. Davis then immediately mailed a dealbook to Walters.

In August 2013, Barington's plan still was not public. On August 20 and August 21, 2013, after receiving the dealbook, Walters called his broker and instructed him to purchase $30 million worth of Darden stock. When Barington's plan became public on October 9, 2013, Walters made approximately $1 million in profit.

On this evidence, a reasonable jury could have found beyond a reasonable doubt that Walters knew, or consciously avoided knowing, that Davis breached a duty he owed to Barington to keep the information confidential and nonetheless traded upon Davis's tip. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (a verdict must be upheld if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").

III. *Restitution and Forfeiture Orders*

A. *Restitution*

Walters raises several challenges to the district court's restitution order, including whether certain fees included in the restitution award to Dean

Foods are recoverable under the Mandatory Victim Restitution Act (the "MVRA"), 18 U.S.C. § 3663A.

After oral argument before this Court, the Supreme Court issued a decision in *Lagos v. United States*, 138 S. Ct. 1684 (2018), which addressed the categories of fees recoverable under the MVRA. *See id.* at 1687. The Government has advised the Court, in a letter pursuant to Federal Rule of Appellate Procedure 28(j), that it consents to a limited remand for the district court to reconsider its restitution order in light of *Lagos*.

We agree that remand is appropriate. We therefore vacate the restitution order and remand for the district court to determine whether the fees encompassed in the restitution award are recoverable under the MVRA, consistent with the Supreme Court's guidance in *Lagos*.

B. *Forfeiture*

On September 20, 2017, the district court entered a forfeiture order against Walters in the amount of $25,352,490. On appeal, Walters challenges the methodology employed by the district court to calculate the forfeiture amount, arguing that it was "arbitrary" and resulted in a grossly inflated amount. Def.-App. Br. at 74.

**1.** *Applicable Law*

We review a district court's legal conclusions regarding forfeiture *de novo* and its factual findings for clear error. *United States v. Sabhnani*, 599 F.3d 215, 261 (2d Cir. 2010). We must determine whether the trial court's method of calculation was legally acceptable, but we "will not disturb a district court's 'reasonable estimate of the [amount], given the available information.'" *United States v. Vilar*, 729 F.3d 62, 95-96 (2d Cir. 2013) (quoting *United States v. Turk*, 626 F.3d 743, 748 (2d Cir. 2010)).

When a defendant is convicted of insider trading, a district court must "order the forfeiture of '[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to [the] violation.'" *United States v. Contorinis*, 692 F.3d 136, 145 (2d Cir. 2012) (quoting 18 U.S.C. § 981(a)(1)(C)). Proceeds is defined as "the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods or services." *Id.* (quoting 18 U.S.C. § 981(a)(2)(B)). Because "[c]riminal forfeiture focuses on disgorgement" of a defendant's "ill-gotten gains," the calculation "of a forfeiture amount . . . is usually based on the defendant's actual gain." *Id.* at 146 (internal quotation marks omitted). The Government must

establish facts supporting a forfeiture amount by a preponderance of the evidence. *See United States v. Roberts*, 660 F.3d 149, 165 (2d Cir. 2011).

### 2. *Application*

The principal question here is whether the district court employed a reasonable method for calculating forfeiture. The district court adopted the Government's estimate of Walters's gains: the value accrued to him as a result of trading on insider information, which was calculated by using the closing price at the end of the first trading day following the public announcement of information that had been tipped to Walters (the "end-of-day method").[10] According to the Government, the end-of-day method rests on the assumption "that the market needs about a day to process material information about a stock and incorporate it into the stock's price." Gov. Br. at 71; *see SEC v. MacDonald*, 699 F.2d 47, 55 (1st Cir. 1983) (en banc) (directing sentencing court in disgorgement context to "determine a figure based upon the price of . . . stock a reasonable time after public dissemination of the inside information"); *SEC v. Wyly*, 788 F. Supp. 2d 92, 100-01 (S.D.N.Y. 2011) (using closing price to calculate profits).

---

[10] Gains were estimated using the end-of-day method for all trades at issue, with the exception of trades occurring on April 30, 2008, June 25, 2008, and February 11, 2009.

Walters contends that instead of employing the end-of-day method, the district court should have adopted the methodology used by the district court in *Contorinis*, in which the court opted to use "whatever the price during the day that results in the least loss . . . in the interest of being conservative." Def.-App. Br. at 71 (quoting *United States v. Contorinis*, 09 Cr. 1083 (RJS) (S.D.N.Y. Dec. 17, 2010), Tr. 59:9-13).[11]  Walters further contends that this would have reduced the amount to $12,651,727.67.

The Government argued, however, and the district court agreed, that Walters's proposed method would result in a windfall because Walters was "trading in huge volumes [and] he himself is actually moving the market . . . in numerous instances," which "can cause a depreciation of the stock price." App. 1037.  Consequently, the Government argued that if the court were to employ Walters's proposed method, he would "get[] the benefit of his own sales."  App. 1037.  Although the Government recognized that Walters did not always sell his stock (so as to cause an artificial dip in price), it argued that the approach was nevertheless appropriate in this case and is "one commonly employed in insider trading cases."  Gov. Br. at 73.

---

[11]     We note that in *Contorinis*, the district court did not use this methodology to calculate gain; rather, it used it to calculate avoided losses.

We are not persuaded that the district court erred in its decision to reject Walters's proposed methodology in favor of the end-of-day method. District courts are afforded broad discretion in calculating illicit gains based on the circumstances of a case. *See United States v. Treacy*, 639 F.3d 32, 47-48 (2d Cir. 2011) (explaining that the calculation of forfeiture "is not an exact science" and district court's forfeiture calculations may "use general points of reference as a starting point for calculating the losses or gains from the [criminal activity] and may make reasonable extrapolations from the evidence"). As the district court explained:

> It suffices to say that I am convinced that the methodology on the estimation of loss in terms of using the closing price at the end of the trading day is most appropriate in this case, the end of the trading day following disclosure, and I recognize that some of the disclosures were made even before the market opened. I think the government is quite correct about the fact that the size of the trades by Mr. Walters is such that they make it particularly inappropriate to use intraday trading. The Court only need make a reasonable estimate of the loss, and the Sentencing Commission says the sentencing judge is in the unique position to assess the evidence and estimate the loss based upon the evidence. And so I will use the end of the trading day methodology.

Sent. Tr. 12.

Given the complexity of calculating gains in insider trading cases, and that the parties submitted detailed briefing as to this issue, we conclude that the district court did not err in its determination that the end-of-day methodology provided a reasonable estimate of Walters's gains for purposes of forfeiture. We therefore affirm the forfeiture order.

## *CONCLUSION*

Accordingly, for the reasons set forth above, the judgment and order of forfeiture are **AFFIRMED**; the order of restitution is **VACATED**; and the case is **REMANDED** for the district court to reconsider the issue of restitution.

JACOBS, *Circuit Judge*, concurring:

Walters's crime was the illegal leaking of confidential information, which is why he is going to jail for five years. The arresting feature of this case is that the supervisor of the FBI investigation was likewise involved in the illegal leaking of confidential information; and the leak of grand jury testimony is in some respects more egregious than anything Walters did -- the FBI supervisor took an oath to uphold the law and was acting in a supervisory capacity to discharge an important public function.

The district court had discretion to forgo a hearing on what happened; still, without a hearing, it is unknown how far or where the abuse reached. The FBI depends on the confidence of the public, jurors and judges. That confidence is critical to its mission; so this kind of thing is very bad for business.